THOMAS COOPER,

                       Plaintiff,                   OPINION AND ORDER

    v.

                                               18-cv-288-wmc

CITY OF BLACK RIVER FALLS, ALEX
BRAD CHOWN, RONALD E.
DANIELSON and KELLY BAKKEN,

                       Defendants.

Plaintiff Thomas Cooper, a former police officer with the City of Black River Falls police department, alleges that the City, through actions of its administrator, police chief, and former mayor, retaliated against him for speaking up in opposition to a plan to transfer management of police services to the Jackson County Sheriff's Department in violation of his rights under the First Amendment of the United States Constitution. Before the court is defendants' motion for summary judgment. (Dkt. #21.) For the reasons that follow, the court will grant that motion, finding plaintiff has failed to put forth sufficient evidence to allow a reasonable jury to find either a deprivation likely to deter an ordianry person from future protected First Amendment conduct or the necessary causal nexus between any protected conduct and the alleged retaliatory acts.

## MOTION TO STRIKE

As a preliminary matter, defendants move to strike (1) plaintiff Thomas Cooper's declaration in opposition to defendants' motion for summary judgment and proposed findings of facts relying on that declaration, (2) Exhibit 70 to deposition of a former police

chief, Scot Eisenhauer, which is a memo Eisenhauer drafted describing events during the course of his employment, and (3) an audio recording of the November 2014 City Council meeting. (Dkt. #49.) Defendants' initial basis for striking Cooper's declaration is that it contains the word "foregoing" as in "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the *foregoing* is true and correct." (*Id.* at 2; Cooper Decl. (dkt. #42) 1.) Based on this, defendants argue that "none of the [subsequent] paragraphs in Plaintiff's Declaration is a sworn statement," failing to meet the requirement of Federal Rule of Civil Procedure 56(e). (*Id.*) This argument is so ridiculous that the court considered disregarding the entirety of the motion to strike as a sanction. Indeed, the use of the word "foregoing" was such an obvious error in choice of noun, it would be unlikely to relieve Cooper of a charge of perjury (or at least, fraud on the court) if the representations that followed in his declaration were proven to be knowingly false. Regardless, this unfortunate bit of wordsmithing could (and should) have been cleared up by a simple phone call between counsel without involving the court. Indeed, once notified, plaintiff's counsel did just that, replacing the wrong word with "following" in Cooper's amended declaration, to which the parties stipulated in an apparent attempt to address some of defendants' bases to strike his declaration.[1]

Turning to defendants' other three objections to plaintiff's summary judgment response, the court will address each by rough category as set forth in defendants' reply. *First*, defendants seek to strike a number of plaintiff's proposed findings of facts on

---

[1] But for defendants' joining in this stipulation, the court would have considered an appropriate sanction. Hopefully, this lapse of judgment is a one-time event. If not, defendants' counsel is now on notice that the court will impose sanctions for a repeat of such a frivolous argument.

foundation grounds, beginning with statements purportedly made by either the City's Administrator, Alex Brad Chown, or its former mayor, Ronald E. Danielson, both of whom are named defendants, along with the City itself, to Scot Eisenhauer, the City's police chief immediately before defendant Kelly Bakken,. (Defs.' Reply (dkt. #63) 1 (citing Pl.'s PFOFs (dkt. #47) ¶¶ 125, 127, 128).) As Eisenhauer explained in his deposition testimony, he has an independent recollection of the meeting, except as to whether Chown or Danielson (or both) made specific statements. (Pl.'s Opp'n (dkt. #61) 8 (citing Eisenhauer Dep. (dkt. #29) 69-74, 83, 86, 119).) Instead, the only evidence of what was specifically said and by whom is contained in Exhibit 70 -- Eisenhauer's recorded recollection -- the admissibility of which rises or falls under Federal Rule of Evidence 803(5). (Eisenhauer Dep. (dkt. #29) 74.) Indeed, *defendants'* counsel resorted to Exhibit 70 at various times in Eisenhauer's deposition to refresh his recollection. (*Id.* at 29-32, 72-74, 81-82, 87, 93, 144.) For that reason, as well as the court's rejection of defendants' challenges to Exhibit 70 for reasons explained later below, the court will overrule this objection.

Next, defendants seek to strike PFOF ¶ 74 for lack of foundation, which is supported by plaintiff's own statements that: "[t]he sign that was placed in the back of Cooper's truck was a point of contention"; and "[t]he City did not like where Cooper parked his truck." (Defs.' Reply (dkt. #63) 2 (quoting Pl.'s PFOFs (dkt. #47) ¶ 74).) The court overrules this objection as well, finding that plaintiff's account of Chief LaBarbera's reaction to his parking the dump truck and the message on the sign on the truck are sufficient for a jury to infer a dispute between plaintiff and the City, if not necessarily the

truth of any point of contention with the defendants. (*See* Cooper 3/20/19 Dep. (dkt. #26) 77, 79, 99-100, 103, 107-08.) Of course, for purposes of both summary judgment and if this case had proceeded to trial, defendants are free to challenge whether plaintiff's belief about the City's view of his truck is relevant or accurate, but defendants have offered no basis to strike the statements altogether.

Defendants also seek to strike plaintiff's PFOF ¶ 138 for lack of foundation. Relying on plaintiff Cooper's own deposition testimony, this proposed finding represents that the part-time investigator position to which he was promoted in August 2016 was "already covered by the Collective Bargaining Agreement and not a created position." (Pl.'s PFOFs (dkt. #47) ¶ 138 (citing Cooper 3/20/19 Dep. (dkt. #26) 159-60).) For purposes of summary judgment, the court must overrule this objection as well. As set forth in plaintiff's PFOF ¶¶ 23 and 24, Cooper was the union president, which provides an adequate basis for him to describe his *understanding* of the provisions of the collective bargaining agreement and their application to his position. Of course, defendants are free to challenge whether his representation is accurate, whether as a matter of law or fact, but a lack of foundation challenge is meritless.

Finally, defendants challenge on foundation grounds plaintiff's PFOF ¶ 189, which lists "numerous individuals" who assisted the police department with fundraising efforts. (Pl.'s PFOFs (dkt. #47) ¶ 189.) Defendants argue that plaintiff "cannot merely state in his opposition brief that he has personal knowledge." (Defs.' Reply (dkt. #63) 3.) However, given the context -- that he was a long-standing employee of the police department and the president of the union -- this statement is sufficient, again at least for

purposes of summary judgment. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994) ("The evidence need not be in admissible form; affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content, in the sense that a change in form but not in content, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial."). This objection is also overruled.[2]

*Second*, defendants objected to a number of proposed findings of facts as hearsay in their original motion. In response, plaintiff argued that some of the proof supporting the challenged PFOFs are actually "[v]erbal acts and/or words offered to show their effect on the person who heard the statement" and, therefore, not hearsay at all. (Pl.'s Opp'n (dkt. #61) 3 (citing *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007)).) For example, defendants seek to strike plaintiff's PFOF ¶ 175, which states in pertinent part that "Cooper was informed by Kay Larson that Chief Bakken had informed her (Larson) that Cooper was no longer allowed to help out with fundraising anymore." (Pl.'s PFOFs (dkt. #47) ¶ 175.) While a hearsay objection to Larson relaying Chief Bakken's statement may have merit if offered for the truth of the matter asserted, defendants' objection is pointless given that their own interrogatory response acknowledges that "Chief Bakken recalls

---

[2] Defendants also seek to strike a paragraph in Cooper's declaration, in which he states that "[c]ertification as an evidence technician requires coursework by the Wisconsin Department of Justice and a test." (Defs.' Reply (dkt. #63) 3 (citing Cooper Am. Decl. (dkt. #60) ¶ 49.) Because plaintiff does not rely on this statement in opposing defendants' motion for summary judgment, the court will overrule that objection as moot for purposes of the present motion, although defendants would retain the right to challenge plaintiff's personal knowledge to make this and other statements if this case were to proceed to trial, understanding that there is a big difference between having that right and exercising it wisely.

verbally communicating to Kay Larson that Plaintiff probably could not volunteer on behalf of the Black River Falls Police Department." (Defs.' Resp. to Pl.'s PFOFs (dkt. #57) ¶ 176.) Defendants similarly challenge plaintiff's PFOF ¶ 203 on hearsay grounds, which states, "Johnson called Cooper and asked what he had done to irritate or displease Chief Kelly Bakken." (Pl.'s PFOFs (dkt. #47) ¶ 203.) Here, too, the court will sustain the hearsay objection to the extent offered for the truth of the matter asserted, but the challenge is again pointless given that defendants do not dispute that Bakken *was* irritated and displeased in their response to plaintiff's proposed findings of facts. (Defs.' Resp. to Pl.'s PFOFs (dkt. #57) ¶ 203.)

Defendants next challenge plaintiff's PFOF ¶ 52, which states, "The following day, on November 20, 2014, when Cooper came into work, LaBarbera pointed to Cooper and Kay Larson (Administrative Assistant) and said, 'In my office -- now.'" (Pl.'s PFOFs (dkt. #47) ¶ 52.) Defendants contend that Larson was not acting in a management capacity, and, therefore, her remark cannot fall within the exception for statement of a party opponent. (Defs.' Reply (dkt. #63) 6.) The obvious flaw with this argument is that *LaBarbera*, as the chief of police, made the statement, *and* to Cooper, not just Larson. As such, the objection is overruled.

Defendants also seek to strike plaintiff's PFOF ¶ 210, which states "In 1994, the Sheriff of the Jackson County Sheriff's Department at that time, Sheriff Richard Galster, attempted to terminate Cooper's employment with the Sheriff's Department." (Pl.'s PFOFs (dkt. #47) ¶ 210.) Defendants obliquely argue that there must be an "oral assertion or non-verbal conduct that Cooper is relying on to make this statement," either of which

is hearsay.  (Defs.' Reply (dkt. #63) 11-12.)  However, plaintiff is not attempting to usher in a statement or non-verbal conduct, but rather relies on Cooper's representation of what happened.  As such, the court will not strike it on hearsay grounds.  Defendants similarly move to strike PFOF ¶ 211, which states, "In 1994, [Cooper's] termination was reviewed by the Jackson County Law Enforcement Committee in an open public hearing.  The Committee found that there was not cause for termination and ordered that Cooper be re-instated.  The Sheriff refused to do so, and Cooper was paid for time while he was on leave and legal fees."  (Pl.'s PFOFs (dkt. #47) ¶ 211.)  The court overrules this hearsay objection for the same reasons.[3]

Last, as alluded to above, defendants challenge on hearsay grounds the admission of Exhibit 70, a written statement by former City Police Chief Eisenhauer, dated December 20, 2017, which plaintiff argues is admissible as a recorded recollection under Federal Rule of Evidence 803(5).  While defendants offer various challenges to the statement falling within a "recorded recollection," the court need not address them because defendants also rely heavily on Exhibit 70 themselves in support of a number of their own proposed findings of facts.  (Defs.' PFOFs (dkt. #37) ¶¶ 139, 140, 144, 147, 148, 159, 161; *see also* Jacobs Decl., Ex. 70 (dkt. #36-14).)  Defendants argue that they cite to other materials in support a number of those findings, and as to some, plaintiff offers no dispute, but defendants' reliance on Exhibit 70 undermines any challenge to its admission on the

_____

[3] Defendants also seek to exclude plaintiff's PFOF ¶ 73, which contains a purported quotation from a newspaper, which in turn quotes Cooper.  The court agrees with defendants that the quote from the newspaper is inadmissible hearsay if offered for its truth.  As such, the court will strike that statement without prejudice to its use for another purpose at summary judgment or, if a proper foundation is laid as to its authenticity, at trial.

grounds that it is unreliable hearsay. Moreover, as it appears to have been made by Eisenhauer while he was still the City of Black River Falls' Police Chief, his recorded recollections may all come in as a statement of a party opponent or business record. As such, this objection is also overruled for purposes of summary judgment.

*Third*, and finally, defendants challenge the admission of an audio recording of the November 2014 Monthly City Council meeting based on lack of authentication. As an initial matter, the recording was produced by defendants in discovery. Indeed, defendants even submitted a *transcript* of the audio recording, albeit without any formal authentication of the audio recording or the transcript. In their reply, defendants explain that their *real* objection is that they have no basis of knowing whether the copy of the audio recording submitted to the court is the same as the copy produced by defendants, speculating that the audio recording itself could not be electronically filed and going so far as to accuse plaintiff of "gamesmanship" in introducing it. (Defs.' Reply (dkt. #63) 8, 10 ("Defendants have no access to that particular disc in order to determine whether it is a copy of the actual recording of the November 19, 2014, hearing and whether any volume controls have been increased or enhanced.").) This is a ridiculous objection. Defendants offer no basis for suggesting that plaintiff or his counsel altered the sound quality of the filed recording; it is simple rank conjecture. Moreover, if they wished, defendants' counsel was free to visit the clerk's office and listen to the audio recording submitted to the court to compare it to the copy plaintiff provided to them. This objection is overruled.[4]

---

[4] Defendants also suggest that the court could simply rely on the transcript they submitted (*see* Jacobs Decl., Ex. B (dkt. #55-2), but, of course, the transcript does not convey volume or tone, and plaintiff represents that Mayor Danielson "raised his voice" during the meeting.

As reflected in the discussion above, defendants' motion to strike for the most part was a tremendous waste of the parties' money and this court's time and resources, including parts that were utterly pointless, if not frivolous. The court expects better from defendants' counsel and would entertain a motion for sanctions in the form of the cost of plaintiff's counsel's time for the portions deemed frivolous.

## UNDISPUTED FACTS[5]

### A. Overview of the Parties

Plaintiff Thomas Cooper was a full-time police officer with the Black River Falls police department from 2005 until his termination on October 1, 2017. Before his employment by the City of Black River Falls, Cooper was a police officer for the Village of Merrillan Police Department from approximately 1994 to 2005. While Cooper only resided in Black River Falls itself for a short one to two year period (from 2009 or 2010 through 2011), he has been active in the community, working in and for the City, serving on the school board, having children attending schools in the City, and attending religious services, medical appointments and other events there.

As previously mentioned, Cooper was also president of the City's police department's union from 2011 until his termination in October 2017. In that capacity, he was responsible for advocating on behalf of the staff and union, negotiating contracts, monitoring operations for work rule violations or unfair treatment of the staff, assisting in the processing of grievances, representing staff during any disciplinary action, and making

---

[5] Based on the parties' submissions at summary judgment, the court finds the following facts material and undisputed, unless otherwise noted.

sure dues were paid.

Defendant City of Black River Falls has a population of approximately 3,500 and is the seat of Jackson County, Wisconsin. The City's police department was created via charter ordinance in 1883. The current charter ordinance sets forth that the police department is to be staffed by one police chief/criminal investigator, one full-time administrative assistant, five full-time police officers, and four limited term part-time police officers.

Defendant Ron Danielson was the City's mayor from April 2008 until April 2016. Since June or July 2013, defendant Alex Brad Chown has served as the City Administrator/Clerk/Treasurer, and continues in that role today, making him responsible for the administration of all activities of the City. In that capacity, Chown would have to approve any promotions in the Black River Falls Police Department, and he would have been involved in any reprimand decisions. Defendant Kelly Bakken is (or at least was for portions of the relevant time period here) the City's Police Chief, beginning September 4, 2017.

## B. Background

### 1. Cooper's Prior Employment with Jackson County Sheriff's Department

Before his employment with the City of Black River Falls beginning in 2005 and with the Village of Merrillan beginning in 1994, Cooper had also been employed by Jackson County, before his involuntary dismissal in 1993. Cooper brought a wrongful termination action against Jackson County, which was resolved via a settlement agreement.

While Cooper claims not to believe that agreement contained a non-rehire provision, he does not remember the terms, and cannot say for certain that it does not. He also cannot confirm whether he was ever in possession of the settlement agreement, nor does he remember the attorneys who represented him or the County in that proceeding.

### 2. Cooper's Prior Complaints of Retaliation and Investigation of Mayor Danielson

In April 2013, Cooper contacted Governor Scott Walker complaining that Mayor Danielson was retaliating against him and the Black River Falls Professional Police Association because of their support of the Governor and the fallout of Act 10. The Governor's office did not respond to Cooper's request for an investigation. In August 2013, Cooper also sent emails to the Teamster Union business agent complaining that Mayor Danielson was "telling known lies about me," damaging his reputation, and that he had "breached the threshold of workplace harassment and is creating a hostile work environment for me." (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶¶ 21-22.) Cooper further described being "fearful that Mayor Danielson is preparing to terminate my employment . . . due to my position as Union President." (*Id*. at ¶ 22.)

In December 2013, Cooper next describes being approached by a person who, after asking to remain anonymous, reported that the City was performing sewer repair work in front of the home of Mayor Danielson's brother. The person expressed concern that the mayor's brother did not have to pay for these repairs and asked if Cooper could look into it.[6] Cooper took this information to the Chief of Police at that time, David Frederick, who

---

[6] The court considers these statements solely for the effect that it had on Cooper, rather than for

directed him to investigate the matter. As part of that investigation, Cooper interviewed Mayor Danielson for several hours, prepared a report, and forwarded it to the Jackson County District Attorney's office. The D.A. Gerald Fox opted not to prosecute Danielson because he was unable to establish proof that any crime had been committed.

Apparently after this decision, Cooper then emailed an Assistant Attorney General for the Wisconsin Department of Justice in April 2014, inquiring whether a police department could file its own complaint against the mayor in circuit court or whether the Department of Justice would file a complaint on behalf of the police department. Cooper maintains that he did not send this email on his own, but rather at the behest of Chief Frederick, who was curious and had questions regarding the matter. Apparently, nothing came of this request for prosecution either.

### C. Plan to Transfer Police Services to the County

In 2013 and 2014, the City of Black River Falls' police department struggled with staffing, and particularly with ensuring 24-hour police coverage. Plaintiff does not dispute this generally, although he points out that there were times when officers were available to cover shifts and were not contacted to do so. By the middle of 2014, the City began exploring whether to contract police services to Jackson County. City Administrator Chown testified that the timing made sense given the likely impending retirements of Chief Frederick and administrative assistant Kay Larson.

While the parties dispute whether this change would have eliminated the City's

---

the truth of the matter asserted.

police force or simply transferred the oversight to the County, there is no dispute that the police services offered would remain the same, with only the patches on the officers' uniforms changing.  In addition, Jackson County Sheriff's Department planned to increase its personnel by four full-time deputies, one full-time patrol sergeant and two part-time deputies, although any City police officers would have to apply for employment.  Cooper further maintains that Administrator Chown and Mayor Danielson said that it was "possible" current City employees would have to "go back on probation [and] lose all their seniority," so that "it would be like starting all over as a new employee for Jackson County." (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶ 49.)

### D. Initial Opposition Efforts

When Cooper and others learned of this transfer plan, they formed a group called "Friends of the Black River Falls Police Department" to oppose it, including conducting a petition drive to inform the community and encourage people to attend the council meetings.  Cooper wrote that petition and coordinated the signature drive, which ultimately obtained 412 signatures.

The petition stated:

> We the people of the greater Black River Falls area due hereby respectfully express our support to the Black River Falls Common Council to maintain its independence by keeping and supporting your own Police Department.  We support the citizens of Black River Falls in maintaining their own Police Department staffed 24 hours per day, seven days a week, 365 days per year.
>
> We further support the Black River Falls Common Council in passing a resolution declaring that its citizens and Council Representatives support and recognize the Black River Falls

> Police Department as an essential service provided to us for the continued protection of the citizens of Black River Falls and welcomed guests to our community.
>
> We the undersigned ask that this petition be recognized as the will of the people and ask that our elected officials carry out the will of the people as they are elected and sworn to do.

(Cooper Decl. Ex. A (dkt. #42-1).)

### E. November 2014 City Council Meeting and Fall-Out

On November 19, 2014, the City Council considered the plan to contract out police services through the Jackson County Sheriff's Department, including the petition Cooper had spearheaded. While present at that meeting, Cooper maintains he was there only in his capacity as a private citizen, emphasizing that he was not wearing his police uniform. At the same time, Cooper acknowledges that he was the president of the Black River Falls police department's union at the time of the hearing. (Defs.' Resp. to Pl.'s PFOFs (dkt. #57). Regardless, because public comments at this meeting were limited to residents or business owners of Black River Falls, Cooper could not speak. When asked by the City Counsel during the hearing, City Administrator Chown recommended transfer of services to Jackson County.

Ultimately, the City Council voted 4-4, with Mayor Danielson casting the tie-breaking vote in favor of transferring police services to the County and rejecting Cooper's petition. From the transcript and the minutes of the meeting, however, it was also clear that despite this vote, citizens of the City could petition for a binding referendum with a minimum of 200 signatures within 60 days of the vote. Moreover, after Mayor Danielson cast his vote, Cooper spoke up, and Danielson recognized him as "Officer Cooper." The

pertinent portion of the hearing transcript reads as follows:

MR. COOPER: Tom Cooper, Town of Adams. I direct this question at Attorney Diehn. Can we run a recall election at the same time as a referendum and remove council members?

MR. DIEHN: You can obviously do a recall election. That's not -- I didn't research the procedure for that, so we -- I can research that and talk to you about it --

MR. COOPER: Okay.

MR. DIEHN: -- and get back tomorrow or thereafter.

MR. COOPER: Thank you very much.

MAYOR DANIELSON: I don't understand a recall because it's either referendum either way. I don't understand your reasoning there, Tom, but, so.

MR. COOPER: Well, I'll try and make it a little more clear. I think since you cast the tie -- the tie vote -- and broke the tie on this thing -- [] I think that there's a direct conflict of interest for you to vote on it at all.

MAYOR DANIELSON: That's the only time I can vote is on a tie.

MR. COOPER: . . . I think that you should have called for a second vote or (inaudible) anything, but I don't think you're entitled to vote on it due to a conflict of interest on your part.

MAYOR DANIELSON: I don't know where --

MR. COOPER: And that's my feeling.

MAYOR DANIELSON: Where's the conflict, Tom?

MR. COOPER: The conflict is, is that the city police department investigated you for misconduct in public office.

MAYOR DANIELSON: And what did the DA say on that, Tom?

MR. COOPER: The DA said --

MAYOR DANIELSON:  You never brought that up.

MR. COOPER:  Oh, yeah.

MAYOR DANIELSON:  He threw it out.

MR. COOPER:  The DA said --

MAYOR DANIELSON:  Yep.

MR. COOPER:  -- that he could find nowhere in the statutes that allowed you to do what you do, but he's deciding not to charge you at this time after having a stern conversation with the city administrator about cleaning up your act.  That's what the district attorney said.

MAYOR DANIELSON:  No, I think you better read that over again.

SPEAKER:  I don't think that's appropriate discussion.

MAYOR DANIELSON:  Anyway, to make it --

MR. COOPER:  Well, thank you for your time.

(Jacobs Decl., Ex. B (dkt. #55-2) 71-74.)

At his deposition, Cooper clarified that the conflict of interest to which he referred was Danielson "being the focus of a criminal misconduct case," something Cooper also posted about on social media shortly after the November 2014 City Council Meeting, (Defs.' Reply to Defs.' PFOFs (dkt. #58) ¶ 63.)[7]  Defendants maintain that Cooper was aware of the details of that investigation *only* because of his role as a police officer; plaintiff contends, however, that the investigation and the DA's decision not to prosecute Danielson had been made public at that point, directing the court to multiple March 2014 newspaper

---

[7] Specifically, Cooper posted on Facebook: "This made a tie so Mayor Ron Danielson made his conspiracy come true and shut the BRFPD down.  Th[is] was clearly a retaliatory act for him being the focus of a criminal misconduct case."  (Defs.' PFOFs (dkt. #37) ¶ 78.)

articles and a 53-minute discussion in an open session of the City Council meeting on April 2, 2014.

Defendants also contend that Cooper "got loud and acted in an unprofessional manner" during the meeting, pointing in support to the deposition testimony of City Administrator Chown and of then Interim Police Chief LaBarbera.[8]  For his part, plaintiff directs the court to the audio recording itself to dispute this proposed fact.  Plaintiff also contends that Mayor Danielson raised his voice when he asked Cooper the results of the DA's findings.  From the court's review of the recording, both Danielson and Cooper raised their voices at the point where Danielson asked Cooper what the DA said about the investigation, or a reasonable jury could find.

On November 20, 2014, the day after the City Council Meeting, soon-to-be Chief LaBarbera called Cooper into his office to speak with him about his demeanor at the meeting the night before.  Cooper contends that "LaBarbera, in an angry voice said that he had enough of his (Cooper's) shit and that Cooper's conduct at last night's meeting was unacceptable and that if Cooper ever did anything like that again, LaBarbera would fir[e] him on the spot."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶ 68.)  LaBarbera denies making these statements, other than telling him that he believed his conduct was unacceptable.  (Defs.' Reply to Defs.' PFOFs (dkt. #58) ¶ 68.)  Cooper also represents that he asked LaBarbera, "Are you interfering with my rights to free speech that I exercised last night, or

---

[8] Defendants submit a number of other facts about Chief Frederick, but none appear material to the motion for summary judgment currently before this court.  Chief Frederick submitted a letter of resignation on September 16, 2014, effective December 31, 2014.  At some point between September 2014 and December 2014, however, it appears that Pat LaBarbera was appointed interim chief.

what are you referring to?" (Pl.'s PFOFs (dkt. #47) ¶ 54.) Cooper maintains that LaBarbera responded, "You're on notice. I've had enough of you. Keep it up and you'll find out how it goes." (*Id.*) However, Cooper was not issued any written discipline as a result of his conduct the evening before or LaBarbera's talk with him on November 20.

### F. Ongoing Efforts to Oppose Transfer to the County

In light of the City Council's vote, the "Friends of the Black River Falls Police Department" geared up for a binding referendum to maintain police services at the City level, and Cooper remained active in these efforts. At his deposition, Cooper explained that he continued to act "as a person . . . that's grown up in this community, has been part of the community, . . . [and] felt that this was a decision that was best made by the people of the community, not just one person." (Cooper 3/20/19 Dep. (dkt. #26) 71-72.) Between November 2014, and April 2015, Cooper placed signs in and around the City, attended meetings, authored letters to the editor, posted YouTube videos and appeared in numerous radio ads and television interviews in support of the referendum. He similarly participated in a closed Facebook group named "We Got This" with fellow employees of the City, including Kay Larson, Andy Noack, Jennifer Noack and Scott Moldenhauer. Other City employees Dean Taylor, Aaron Thiesing and Mike Puffer also participated in referendum-related activities.[9]

The referendum petition was presented to City Administrator Chown in January

---

[9] Defendants point to postings of cartoons and other intra-group communications, which purportedly mocked or criticized Chown and Danielson (Defs.' PFOFs (dkt. #37) ¶¶ 84-87), but it is not clear how these postings and communications are relevant to plaintiff's claim given that there is no indication defendants were privy to them.

2015 and verified as containing the requisite number of signatures, after which a vote was set for April 7, 2015, and Cooper's efforts in support of the referendum continued.  He submitted a letter to the *Banner Journal* in February 2015, which was published under the title, "Let's take a look at the facts."  (Pl.'s PFOFs (dkt. #47) ¶ 64.)  City Administrator Brad Chown responded with his own letter, published with the title, "The whole truth." (*Id.* ¶ 65.)  In March 2015, Chown also emailed an individual named Jay Eddy, with a "cc" to Mayor Ronald Danielson and a subject line of "RE: Referendum Question" that read:

> Ron is submitting a letter to the editor to the Banner for next week.  I am sending my response letter to the Chronicle following Tom Cooper's letter appearing in that publication this week.  I am also working with Dick Deno at WWIS on radio spots.  Frustrating, but I have to be careful what message is sent from my office -- it must be neutral and not advocating either way.

(Pl.'s PFOFs (dkt. #47) ¶ 67.)  Cooper also made a large, double-sided sign, approximately 4 feet by 8 feet, which he attached to his dump truck, reading, "Save the Black River Falls Police Department" and "Don't Throw 130 Years Away," or words to that effect.  In late February 2015, Cooper parked his truck in the municipal parking lot in front of City Hall. Apparently referring to the truck, Cooper posted a message on a private Facebook group that stated, "Smile at that, Brad."  (Defs.' PFOFs (dkt. #37) ¶ 91.)

Defendants submit voluminous proposed findings of facts concerning parking restrictions in or around City Hall, their enforcement, and Cooper's violation of those restrictions.  The court need not recount them in detail, other than to note that on February 23, 2015, then Interim Chief LaBarbera called Cooper into his office to talk about where he had parked his dump truck.  Defendants contend that LaBarbera and Cooper

had a conversation about whether it was a violation; plaintiff similarly represents that LaBarbera informed Cooper that he was in violation of parking restrictions and Cooper responded, that he was not. Apparently as a prelude to this discussion, Interim Chief LaBarbera had asked City Administrator Chown if anyone had complained about Cooper's truck, to which Chown responded that there were no citizens' complaints, but that "[t]here were city employees and past city employees that mentioned it." (Defs.' Reply to Defs.' PFOFs (dkt. #58) ¶ 106.) At his deposition, LaBarbera testified that Chown told him that he had received a "complaint" about the vehicle -- that it was in violation and parked illegally -- pointing to a document on his desk as if it were the complaint. (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶ 110; Pl.'s PFOFs (dkt. #47) ¶ 85.)

During Cooper and LaBarbera's later exchange, Cooper maintains that he asked LaBarbera if either Chown or Danielson made the complaint, to which LaBarbera supposedly responded, "I'm not going to tell you." (Defs.' PFOFs (dkt. #37) ¶ 112.) In contrast, Chown maintains that he "did not care and never spoke with Cooper about where his truck was parked, outside of the days on which votes could be cast." (*Id.* ¶ 108.)[10] Plaintiff disputes this, pointing to Chown's own efforts to oppose the referendum -- and specifically, his posting of a sign on all doors of city hall, which indicated that a "yes" vote on the referendum would result in a cost of $615,000 in taxpayer money, compared to a "no" vote, which would cost taxpayers $470,000.

---

[10] Chown sent Cooper a letter informing him that from Monday, March 23, through Tuesday, April 7, his truck with a political sign could not be parked within 100 feet of either entrance to City Hall. (Pl.'s PFOFs (dkt. #47) ¶ 99.)

Cooper further contends that in a second conversation with the Interim Chief the following day, LaBarbera told him that the sign was seen as "taunting" City officials and that they wanted him to move the truck.[11]  (Defs.' PFOFs (dkt. #37) ¶ 113.)  In the end, Cooper agreed to move the truck but then moved it just 6 feet.

The City voted on the referendum on April 7, 2015.  It passed by 3 votes, which meant that police services would continue to be managed by the City.

### G. Alleged Retaliatory Acts

Following this vote, Cooper contends that he was subjected to a variety of retaliatory disciplinary acts by a number of individuals over a three-year period of time.  The court recounts these acts below.

#### 1. Contemplation of Discipline

In July 2015, Cooper was in a police uniform with fellow officer Dean Taylor, while eating lunch at Oriental Kitchen.  Cooper's daughter and grandson were at the restaurant as well.  Cooper's grandson was being fussy, and apparently in an attempt to entertain him, Cooper picked up his sippy cup and pretended to drink from it.  Officer Taylor snapped a photo of it and posted it on Facebook.

Interim Chief LaBarbera became aware of the photograph and thought that it was "unprofessional."  LaBarbera called Officers Cooper and Taylor into his office to request that Cooper write a statement explaining the photo, and he further demanded that it be

---

[11] Curiously, Cooper maintains that LaBarbera was interested in having him move his truck to an area with *more* visibility.

taken down. Cooper contends that LaBarbera "got really angry, he leaned across the table and was spitting when he spoke." (Pl.'s Resp. to Defs.' PFOFs (dkt. #47) ¶ 130.) Cooper responded that the "whole thing is a crock of shit" and then left work, apparently slamming the door or otherwise making a loud departure. (*Id.*) Cooper claims that he was having chest pains and could not breath.

Interim Chief LaBarbera wanted to reprimand Cooper with a one-day, unpaid suspension for his unprofessional and insubordinate behavior. Cooper contends that the planned discipline was also for the Facebook photo. LaBarbera drafted a "disciplinary complaint" on July 22, 2015, ordering Cooper to be suspended for one day. City Administrator Chown was copied on the complaint, but contends he was not involved in any discipline for this incident. Regardless, LaBarbera's term as interim police chief ended before any discipline was imposed, and the newly-hired permanent police chief opted not to discipline Cooper. The parties dispute whether Chown pressed the new police chief to implement the disciplinary action.

### 2. Denial of Creation of New Position / Promotion

On August 10, 2015, Scot Eisenhauer was hired to perform the roles of permanent police chief and investigator. Early in his tenure, Chief Eisenhauer wanted to create an assistant police chief position and to choose Cooper for that position. However, neither the charter ordinance nor the collective bargaining agreement allowed for such a position. Moreover, an assistant police chief position would not be a union position. When Eisenhauer approached Administrator Chown and Mayor Danielson about creating this position and placing Cooper in it, either or both advised that he or they "did not like

[Cooper] and that he could not be trusted."  (Defs.' Reply to Defs.' PFOFs (dkt. #58) ¶ 148.)

Chief Eisenhauer's December 20, 2017, written statement, previously referred to as "Exhibit 70," also reflects that either Chown or Danielson stated that Cooper could not be trusted because of his "vote in the police department," which Eisenhauer explained during his deposition had occurred before he had arrived.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #57) ¶ 128.)  At one point in his deposition testimony, Eisenhauer also recalled either Chown or Danielson stating that "Tom [Cooper] is always out for Tom," meaning Cooper would not make for a good managerial employee because his self-interest would interfere with his ability to look out for others.  Whatever the details of their communication, Chown also informed Eisenhauer that in order to create a new position, he would have to create a job description and seek approval from the City Council.  Finally, Cooper claims that in a subsequent conversation, Chief Eisenhauer told him that Chown and Danielson said that he could not be trusted because of his referendum activities and that Eisenhauer should pick somebody else.[12]

Ultimately, Eisenhauer never took steps to create a new assistant chief position, and he promoted Andy Noack to the sergeant position.  Even so, Eisenhauer decided to give Cooper investigation responsibilities, which even plaintiff characterizes as a "promotion."[13]

[12] While this statement may not be admissible for the truth of the matter asserted against defendants Chown and Danielson, it is admissible as to Chief Eisenhauer's state of mind against the City.

[13] Somewhat ironically, defendants chose to put this characterization in dispute, pointing to Eisenhauer's testimony that "it wasn't a promotion.  It was just an assignment."  (Defs.' Reply to Pl.'s PFOFs (dkt. #58) ¶ 159.)

Cooper also claims that while Eisenhauer told him he could not get a pay increase past Chown, "maybe he could try to catch it up with Cooper later." (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶ 163.) Chown was aware that Eisenhauer had assigned Cooper some investigation duties.

### 3. Required to Undergo a Fitness for Duty Examination and Shooting Recertification

In January 2017, Officer Cooper took a medical leave for bilateral knee replacement surgery, resulting in him being off work for 55 days. When he returned to work, he was using a walker and a cane. On March 14, 2017, Cooper submitted medical documentation stating that he could return to work with restrictions as of that date and could return to work with no limitations on April 17, 2017. When Cooper returned to work, Chief Eisenhauer had concerns about his fitness for duty, and specifically wanted to make sure Cooper both did not exacerbate his condition and could do the job of a police officer. As context, Cooper weighed more than 400 pounds in early 2017. Eisenhauer wanted him to complete a fitness-for-duty test, and he at least attempted to schedule one, although it did not happen before Eisenhauer's resignation from the police force on April 14, 2017.

Before returning to full duty, Administrator Chown also wanted Cooper to requalify with his service weapon. While pointing out that the written policy requires police officers who are off duty for 90 days or longer to requalify with their firearm, and Cooper's leave was less than 90 days, Cooper does not dispute that he was asked to requalify. Chown further avers that he wanted Cooper to requalify out of concern with his ability to shoot in a variety of physical positions, including kneeling.

Officer Cooper received an official letter dated May 3, 2017, from Kay Larson, the long-standing administrative assistant for the City's police department, who was placed in charge of the day-to-day operations of the department after Eisenhauer's resignation, stating that Cooper's return to work was not accepted by the City. In response, Cooper sent Larson a letter asking ten specific questions. Larson did not respond formally, informing Cooper that Chown had instructed her not to do so. Cooper then underwent a fitness for duty evaluation, which he passed. Cooper also passed his firearms recertification and returned to full duty on June 1, 2017.

### 4. Evidence Room Responsibility

With her management responsibilities, Administrative Assistant Larson then assigned Cooper with the responsibility to clean up the department's evidence room, and to act as the "evidence technician." This "duty assignment" was in addition to Cooper's patrol and investigative officer responsibilities. Cooper maintains that Larson also told him that City Administrator Chown directed her to make this assignment.[14] The duties included checking evidence in and out. Cooper had preformed these duties when he worked for the Merrillan Police Department, and he had also performed these duties previously for the Black River Falls Police Department. Most recently, however, Chief Eisenhauer had assigned these duties to another officer, Andy Noack, even though defendants now maintain that Cooper was the only officer at that time certified as an

---

[14] Both Chown's statement to Larson and Larson's statement to Cooper appear admissible as a statement of a party opponent, given both Chown being named a defendant and his administrator position for the City, as well as Larson being named de facto Chief of Police department during this period, at least for purposes of its day-to-day activities.

"evidence technician." (Defs.' PFOFs (dkt. #37) ¶ 189.)

Cooper not only disputes that he was so certified, but claims that the request that he take on the evidence technician duties was retaliatory, because taking on such responsibility would expose him to "huge liability." (Defs.' PFOFs (dkt. #37) ¶ 191.) In particular, he testified that he was aware that there were problems in the evidence room, including evidence being purged. Of course, Cooper acknowledged having no direct knowledge as to the City's actual motive in reassigning him to the evidence technician position in May 2017.

### 5. Payment of Insurance Premium

After his return to work from knee surgery, Officer Cooper took leave again, this time for congestive heart failure on August 11, 2017. This leave request was originally for a period from that date through September 30, 2017, but during leave a number of events seemed to be working against him. To begin, defendant Kelly Bakken was hired to replace Eisenhauer as police chief, effective September 4, 2017. Next, at the outset of her tenure, Bakken was faced with a short staffing issue. On August 17, 2017, Cooper had also been asked to submit FMLA-related paperwork by September 1, but apparently missed that deadline. As a result, newly minted Chief Bakken contacted Cooper about the paperwork, which he submitted on September 14, 2017. Finally, the day before, City Administrator Chown proceeded to calculate what Cooper's available time off would be if he submitted the paperwork and all of the leave was deemed FMLA-related. Based on Chown's calculations, Cooper's FMLA leave had already expired September 8, 2017.

Because Cooper had exhausted all of his FMLA leave, it was Administrator Chown's

position that Cooper was now responsible for *both* employee-related and employer-related payments in order to keep his health insurance current. On September 13, Chown sent Cooper a letter requesting that he pay the full premium on his health insurance. Cooper received the letter on a Wednesday, asking him to remit payment by that Friday. Fortunately, at the time, Cooper had in place a short-term disability policy, something Chown had not dealt with before. Moreover, after Cooper received Chown's letter, he contacted the Union Business Agent Paul Lovinus, who informed Cooper that the terms of the short-term disability policy covered all health insurance premium payments.

This news came as a surprise to both Cooper and Chown. Indeed, when Lovinus contacted Chown to inform him of this policy provision, he said that he was unaware of it. At his deposition, Lovinus testified that he had no reason to question Chown's sincerity in that reply. In any event, Chown immediately sent an email dated September 15, 2017, to Cooper, stating that he was not obligated to pay any premiums in light of his short-term disability policy.

### 6. Denial of Request for Twelve Month, Unpaid Leave of Absence

On or about September 17, 2017, Cooper submitted his most recent documentation to the City, which stated that he had a "life long condition and that he should not return to work until further evaluation to be determined after October 26, 2017." (Defs.' PFOFs (dkt. #37) ¶ 218.) Cooper also informed Chief Bakken that while one physician believed Cooper might be able to return to work, another believed that he would never be able to do so. In light of this information, Bakken made the decision to terminate Cooper.

Cooper does not dispute that this was the basis for her decision, but contends that

"[a]ccording to the collective bargaining agreement, Cooper would have been placed on extended leave without pay." (Pl.'s Resp. to Defs.' PFOFs (dkt. #48) ¶ 221.)[15] In fact, the collective bargaining agreement states that:

> An officer who exhausts his/her sick leave account and is still sick or injured *may* be placed on medical leave without pay until such time as he/she is able to return to work. This leave shall not exceed twelve (12) months and shall be granted *only* when an officer is expected to return to full-time duty as an officer after such leave is completed.
>
> This leave shall be at the discretion of the Employer. . . .

(Crown Decl., Ex. B (dkt. #52-2) § XII.1.E (emphasis added).)

Cooper was told his employment would terminate effective October 1 2017, but was invited to re-apply for future vacancies if his medical condition improved. Just prior to the October 1 date, Cooper sought an additional medical leave of action. Bakken considered his request, but declined to grant it. In a letter to Cooper, Chief Bakken explained, "Unfortunately, you are not currently, and your care providers have advised us that they are unable to determine when you will be, able to perform the duties of your position and, therefore, return to work." (Pl.'s PFOFs (dkt. #47) ¶ 168.) Bakken also testified at her deposition that she denied the request because it was not in the best interest of the department in light of their staffing needs.

### 7. Denial of Volunteer Community Service Officer Position

At the time of Cooper's termination of employment, Chief Bakken advised Cooper

---

[15] In particular, Cooper does not claim that the termination itself was retaliatory, although he does contend that the subsequent denial of additional medical leave was.

that he "would be allowed to help out as a volunteer at fundraising events." (Bakken Dep. (dkt. #23) 34-35.) The parties dispute whether this would necessarily require Cooper to apply to be a Community Services Officer ("CSO"). Cooper contends that after his filing of a grievance concerning the amount of his final termination payment,[16] Bakken's receptiveness to his volunteering changed. Similarly, in their interrogatory responses, defendants stated, "Chief Bakken recalls verbally communicating to Kay Larson that Plaintiff probably could not volunteer on behalf of the Black River Falls Police Department." (Defs.' Resp. to Pl.'s PFOFs (dkt. #57) ¶ 176.) Another Black River Falls police officer, Jeremy James, also testified that Chief Bakken told him in late September or early October 2017 that Cooper was no longer allowed to be at the police department or to volunteer on its behalf.

Cooper would also have a jury infer that Bakken's receptiveness to his volunteering changed because City Administrator Chown became involved in the grievance, something Chown denied at his deposition. Instead, Chown testified that Bakken actually informed *him* that she did not want Cooper volunteering for the department, although Chown did not ask why and she did not give a reason. While there is also no dispute that Cooper never submitted an application to be a CSO, he contends that was only because he'd been informed his services were not welcome. Moreover, there is no dispute that a person need *not* be a CSO to volunteer for fundraising events; rather, numerous individuals assist the police department with fundraising events without being designated as a CSO.

---

[16] Cooper believed he should have been paid for accrued vacation benefits.

### 8. Rejection of Background Report Prepared by Cooper

While working as a police officer, Cooper had prepared a background report for applicant David Hartl. Hartl was not hired by the Black River Falls Police Department. In the late summer of 2018, the Merrillan Police Department requested the background report. While plaintiff offers a number of facts to explain why his report was requested, in short, Merrillan apparently was considering Hartl for its police chief position. Moreover, at that time (the spring of 2018), Cooper was serving as an unpaid, reserve officer for the Village of Merrillan. In that capacity, Cooper mentioned to the then-Chief of the Merrillan Police Department, Mike Johnson, that he had completed the report, who then requested the report from Black River Falls.

After Chief Bakken reviewed the report, she claims to have found it insufficient and incomplete, noting both that it was only two pages long and lacked references to people interviewed, anyone who actually worked with Hartl when he was with the Milwaukee Police Department. Merrillan Police Chief Johnson contends, however, that in an in-person conversation, Chief Bakken provided three reasons for refusing to provide the report: (1) City Administrator Brad Chown denied the request for unknown reasons; (2) Cooper "was not qualified to perform the investigation;" and (3) Cooper was not a "credible source" of information. (Pl.'s Resp. to Defs.' PFOFs (dkt. #58) ¶ 237 (citing Johnson Decl. (dkt. #43) ¶¶ 10-13).)

## OPINION

To prevail on his retaliation claim, Cooper must prove that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely

deter First Amendment activity in the future; and (3) the protected speech was the cause for the employer's action. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *see also Milliman v. Cty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018). With regard to the third element, the plaintiff must make an initial showing "'that a violation of his First Amendment rights was a motivating factor of the harm he's complaining of.'" *Milliman*, 893 F.3d at 430 (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012). If plaintiff makes this initial showing, then "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* (citing *Thayer*, 704 F.3d at 251-52). If defendant produces "evidence that the same decision would have been made in the absence of the protected speech," then "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* (internal quotation marks omitted) (citing *Thayer*, 703 F.3d at 252). "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (internal quotation marks omitted) (citing *Thayer*, 703 F.3d at 252).

Defendants seek summary judgment on three basic grounds: (1) Cooper's speech activities were not protected conduct because he was not speaking "as a citizen on matters of public concern"; (2) Cooper did not suffer deprivations likely to deter an ordinary person from engaging in similar protected conduct going forward; and (3) Cooper lacks evidence to support a finding of a causal nexus between the protected conduct and the alleged retaliatory acts (for at least some of them, namely the more distant events). (Defs.' Br. (dkt. #38) 29-30.) The court addresses each of these challenges in turn below.

## I. Protected Speech

"The inquiry into the protected status of speech is one of law, not fact." *McArdle v. Peoria School Dist. No. 150,* 705 F.3d 751, 754 (7th Cir. 2013) (citing *Spiegla v. Hull,* 481 F.3d 961, 965 (7th Cir. 2007)). In the context of a public employee, "[s]peech is constitutionally protected if (1) the employee spoke 'as a citizen on matters of public concern' and (2) his interest in commenting upon those matters outweighs the employer's interest in promoting the efficiency of its services." *Id.* (quoting *Swearnigen-El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852, 861-62 (7th Cir. 2010). "When employees make statements 'pursuant to their official duties,' they are not speaking 'as citizens' for First Amendment purposes." *Swearnigen-El,* 602 F.3d at 862 (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006)). In determining "[w]hether a statement rises to the level of public concern," the court looks "to the 'content, form, and context' of the statement." *Kristofek v. Vill. of Orland Hills,* 712 F.3d 979, 984 (7th Cir. 2013) (quoting *Chaklos v. Stevens,* 560 F.3d 705, 712 (7th Cir. 2009)) (citing *Connick v. Myers,* 461 U.S. 138, 147–48, 148 n.7 (1983)).

While "[t]he motive of the speaker is relevant as part of the 'context' in which the speech was made, . . . content 'remains the most important factor in determining whether speech addresses a matter of public concern.'" *Id.* at 984 (quoting *Chaklos,* 560 F.3d at 712). The Seventh Circuit has explained that "a public employee's speech," in particular, "may still be protected if the speaker's motives were mixed and also included a desire to help the public." *Id.* Indeed, a public employee could be "motivated *exclusively* by his own self-interest," but his speech could nonetheless be protected by the First Amendment if the point or objective of the speech rises to the level of a public concern. *Id.* at 985-86

(explaining the difference between motive or "secret intent", which simply goes to the context, and the overall objective of the speech).

The parties appear to be in agreement that Cooper's speech at issue was *not* made in his official capacity as a police officer. Instead, the parties dispute whether the purpose of his speech was to address a matter of public concern, or rather to address a matter of a personal interest, since a negative vote on contracting out police services would maintain his employment as a police officer with the City of Black River Falls, as opposed to having to reapply for employment as a police officer with the County. *Id.* at 986 ("In sum, if the objective of the speech—as determined by content, form, and context—is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern.").

In their brief, defendants focus on Cooper's speech at the city council meeting on November 19, 2014. As detailed above, after the city council, including Mayor Danielson as the tie-breaker, voted to approve the plan to transfer management of police services to the County, Cooper expressed his belief that Danielson should not have cast a vote because of his "conflict of interest" concerning the police department generally, and Cooper specifically, who had investigated Danielson's possible misuse of city resources to repair a sewer near his brother's house. Considering the content, form and context of these comments, the court agrees that the objective or purpose of this speech was personal (or more accurately, professional) in nature. Indeed, Cooper expressed very personal, targeted beliefs arising directly out of the results of his investigation as a city police officer that Danielson should have been charged criminally and, therefore, was personally biased

against the police department and should not have cast a vote as to its future management. As plaintiff points out, the criminal investigation was no longer confidential, having both been reported in local newspapers and the subject of an earlier city council meeting, but this actually cuts against plaintiff, having already been made a matter of public concern. Instead, the content and form of Cooper's speech went to his personal stake in the outcome of his investigation and his personal belief that justice had not been done, so much so that he transparently chose to use it at a meeting in which he admittedly had no direct stake *except* as a police officer, being neither a property owner or voter in the City of Black River Falls.

However, as plaintiff points out, and defendants at least acknowledge, Cooper's First Amendment activity extended beyond the brief personal statement he made during the city council meeting. Cooper was an active opponent of the proposal to transfer police services to the County. Over a multi-month period, Cooper organized two petition drives, placed signs in and around the City, including a large sign on his dump truck, authored letters to the editor of local newspapers, posted YouTube videos and appeared in numerous radio ads and television interviews, all in support of the referendum to maintain police services within the City and oppose the transfer of services to the County, where he did live and vote.

As far as the court can discern, in opposition to summary judgment, Cooper does not explain his motivation for *opposing* the transfer of police services to the County. Specifically, he does not explain why he believed the City should maintain control of police services over the County. Instead, when asked at his deposition why he supported these

actions, he simply testified as to why he supported the decision being made by a binding referendum. (Cooper 3/20/19 Dep. (dkt. #26) 71-72 (explaining that "as a person . . . that's grown up in this community, has been part of the community, . . . [and] felt that this was a decision that was best made by the people of the community, not just one person").)[17] While this explains his support for the referendum process, it falls short of explaining why he supported voting yes on the referendum.

Still, evidence of one's motive only informs the context of the speech. Again, considering the objective of the speech in light of its content and context -- opposition to the transfer of services by speaking at forums, petition drives, signs, letters to the editor, among other forms, over a lengthy period of time, sometimes in response to speech supporting the transfer of services -- the court agrees that his speech concerned a matter of public concern, even if part of Cooper's motive, if not his exclusive motive, in opposing the transfer was to avoid having to apply for a job with the County, for which he may well have faced barriers given his past employment history. As to the first element of his retaliation claim under the First Amendment, Cooper engaged in protected conduct in opposing the transfer of police services from the City to the County.

## II. Alleged Retaliatory Acts Motivated by Protected Conduct

As for the second and third elements of Cooper's First Amendment claim -- a

---

[17] Notably, Cooper also disavowed any claim that he was acting in his capacity as union president in opposing the transfer of police services to the County. (Cooper 3/20/19 Dep. (dkt. #26) 71-72 ("Q. Was your motive at that point in time to fight to keep the Black River Falls Police Department open? A. Without question. Q. As an officer of the department? A. No. Q. As a union president? A. No.").

retaliatory act and a causal nexus -- the court will consider them elements together in addressing plaintiff's laundry list of alleged retaliatory deprivations, which span a three-year period.

### A. LaBarbera's November 20 statement

Following his statement at the November 19, 2014, city council meeting, Cooper alleges that then Interim Police Chief LaBarbera called him into his office and yelled at him for being unprofessional. The court's determination that this speech was not protected conduct dooms any claim based on this action alone. Indeed, LaBarbera's alleged statements highlight that he was reacting to Cooper's airing of his very personal grievance over the D.A.'s decision not to charge the Mayor criminally based on Cooper's investigation, as well as his tone in raising this concern.

Even if plaintiff's comments were protected conduct, LaBarbera did not discipline Cooper, and while the court agrees with plaintiff that he need not point to a "materially adverse employment action" to bring a First Amendment retaliation claim (Pl.'s Opp'n (dkt. #46) 11-12), he still must point to an event that a reasonable jury would find likely to deter an ordinary person from engaging in future First Amendment activity. Here. LaBarbera's dressing Cooper down about being unprofessional during the city council meeting absolutely had no deterrent effect, since Cooper engaged in prolific First Amendment activities in the months following, even crediting that perhaps Cooper has thicker skin than the ordinary person.

Finally, with respect to this event, plaintiff also fails to explain how any of the defendants are liable for Chief LaBarbera's statements to Cooper. Not only is LaBarbera

not a defendant, but plaintiff fails to explain how the City is on the hook under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which would require him to show that the constitutional violation was "caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Nor does plaintiff attempt to tie LaBarbera's statements to Chown or Danielson.

### B. Dispute Over Parking of Dump Truck

Plaintiff also points to Interim Chief LaBarbera's statements in February 2015, in which he was told that his dump truck was parked in violation of a two-hour parking restriction and that a complaint had been received about the prominent placement of the dump truck in front of the police station. Here, too, plaintiff fails to put forth evidence that these "actions" constituted a deprivation likely to deter future First Amendment activity, especially when the apparent resolution was that Cooper simply moved his truck all of six feet. Moreover, plaintiff again fails to tie LaBarbera's actions to any of the defendants.[18]

---

[18] Plaintiff also points to City Administrator Chown's March 2015 letter, informing Cooper that he could not park his truck with political signs within 100 feet of City Hall during the voting period on the referendum. Cooper acknowledges that this is not, in and of itself, retaliatory, but contends that it is in light of his allegation that Chown posted signs opposing the referendum that were kept up through election day. (Pl.'s Opp'n (dkt. #46) 13-14.) This argument makes no sense. As Cooper himself acknowledges, Chown's request to move his truck to be in compliance with prohibition of political in the vicinity of polling places cannot constitute a retaliatory act.

## C. 2015 Sippy Cup Photograph

Next, Cooper complains of the threat of discipline Interim Chief LaBarbera issued in July 2015 as a result of his posting a photograph of himself in uniform at lunch and appearing to be drinking from his grandson's sippy cup. While LaBarbera's reaction may have been overblown, there is *nothing* to suggest that this threat of discipline was tied to Cooper's First Amendment activity in opposing the transfer of police services to the County. If anything, LaBarbera's description of Cooper's actions as "unprofessional" -- the same term he used in describing Cooper's statements to the City Council on November 19, 2014 -- suggests that he was linking this sippy cup photograph to other behavior he had deemed unprofessional, rather than Cooper's First Amendment activity. Moreover, while there is no dispute that Chown as the City Administrator, was involved in any reprimand decision within the police department, LaBarbera's time as interim police chief came to an end before any disciplinary action could be taken *and* the next police chief opted not to impose discipline. Finally, whatever else may be said in his defense, no reasonable jury could find that either Cooper's outburst at the end of a city council meeting based on his role in a criminal investigation or posting of himself in uniform drinking from a sippy cup was not a proper subject of possible discipline for unprofessional conduct. Regardless, for reasons already discussed, there is no evidence tying LaBarbera's alleged retaliatory acts to any of the defendants.

## D. New position under Police Chief Eisenhauer

Perhaps Cooper's best evidence in support of his retaliation claim is that City Administrator Chown and/or Mayor Danielson deterred then Police Chief Eisenhauer from

creating an assistant police chief position and placing Cooper in it. While a reasonable jury could find that any causal nexus was broken by Eisenhauer's decision not to initiate a formal process for creating that position, the evidence also could give rise to an inference that because of defendants' influence, Eisenhauer viewed such a move to be futile, at least with respect to placing Cooper in it.

Even crediting Eisenhauer's testimony that either Chown and/or Danielson told him that they did not like Cooper and that he could not be trusted, however, Cooper lacks any evidence tying these statements to his protected First Amendment activity opposing the transfer of services. To the contrary, while Eisenhauer mentions a passing reference to a "vote in the police department," he goes on to testify that Chown and/or Danielson expressed concerns about Cooper being placed in a management position. A reasonable jury would have to view this alleged statement in the context of Cooper's speech during the November 19 city council meeting, as well as other unprotected activities described in the fact section above in which he repeatedly complained of retaliation that was unconnected to the protected conduct underlying his retaliation claim.

Moreover, this alleged action occurred six months after the vote on the referendum signaling *the end* of Cooper's protected conduct, and in recognition of the referendum succeeding, the City appointing a new police chief. At most, since Eisenhauer did not endorse any influence of any defendant on his decision not to proceed with an assistant police chief position, a reasonable jury would have to speculate on this record to find that Chown and/or Danielson were still motivated by Cooper's opposition to the transfer of police services to the County in expressing their concerns about Cooper's trustworthiness

or management skills, especially after considering the plaintiff's questionable, unprotected conduct that could have given rise to those comments.

### E. Fitness for Duty Evaluation and Firearms Recertification

Next, Cooper claims that defendants retaliated against him by requiring him to undergo a fitness for duty evaluation and a firearms recertification after he was on medical leave in 2017 for bilateral knee replacement surgery. Requiring a police officer on extended medical leave to undergo a fitness examination and recertification does not appear to be a deprivation that would deter one from engaging in First Amendment activity. Moreover, these alleged retaliatory acts occurred *two years* after his protected conduct, even more remote for a reasonable jury to infer a link. Moreover, there is *nothing* tying these actions to plaintiff's opposition to the transfer of police services to the County.

Cooper would also make much of the fact that the police department's policy only *requires* firearms recertification after being on leave for 90 days, but there is nothing expressly *limiting* the requirement to the length of a leave.[19] Here, in particular, requiring Cooper to undergo such recertification makes sense in light of his medical condition. Plaintiff's attempt at raising a pretext argument falls flat. Regardless of whether these demands were reasonable, Cooper has no evidence to support a finding by a reasonable jury that defendants were motivated by his protected conduct in imposing the fitness requirements, both of which he ultimately passed regardless.

---

[19] Moreover, it appears that it was close to 90 days between Cooper's leave for surgery and when his doctors released him to work with no restrictions, providing further support for this requirement.

### F. Evidence Room Responsibility

After Eisenhauer resigned, Kay Larson, the police department's administrative assistant, took over management responsibilities for a brief period. In May 2017, shortly after Cooper returned from his medical leave, Larson appointed Cooper as the evidence room technician based on Chown's recommendation. At first glance, this would not appear to be a retaliatory action, but Cooper explains that there were serious problems with the evidence room and, therefore, Larson's appointment of Cooper to this role set him up "for potential liability and failure." (Pl.'s Opp'n (dkt. #46) 15.) Still, the court is hard-pressed to understand how this action could deter a reasonable person from future First Amendment activity.

Even crediting Cooper's concern about being set up, it does not appear Cooper actually took on this role or suffered any adverse action as result of the appointment. (Cooper 3/20/19 Dep. (dkt. #26) 181-83 (describing the one time Cooper and a Sheriff's Department representative conducted an inspection, which resulted in them sealing the room and prompting the City to hire an outside investigator to determine whether the evidence room had been previously compromised).) Assuming this action could constitute a "deprivation," again Cooper has *no* evidence tying either Larson's or Chown's decision to place him in this role to his prior protected conduct.

### G. Confusion about Insurance Premium Payment

Cooper also speculates that Chown's letter to him in September 2017, while he was again on medical leave due to congestive heart failure, requiring him to pay his health insurance premiums was in retaliation for his prior protected conduct. However, there is

no dispute that Chown sent this letter without understanding that Cooper had a short-term disability that covered these premium payments -- a fact of which Cooper was also unaware.  Moreover, once the issue was clarified by the union representative, Chown appears to have readily sent another communication to Cooper informing him that no insurance premium payments were due.  In light of this record, there is *no* evidence from which a reasonable jury could infer a deprivation, much less that Chown was motivated by Cooper's long past First Amendment activity, now some two and a half years removed from those events.

### H. Refusal to Place Cooper on Unpaid Leave

With defendant Chief of Police Bakken now in place, Cooper alleges that her decision in October 2017 not to extend him unpaid leave for a year was also in retaliation for his protected conduct in 2014 and 2015.  First, Cooper fails to explain how the denial of unpaid leave would constitute a deprivation in light of the undisputed facts that at least one of his doctors believed Cooper would never be able to return to work.  Second, there is again no evidence tying Bakken's decision to his prior protected conduct, especially in light of the fact that she was not involved in the plan to transfer services to the County.  Third, in light of Cooper's medical condition and the plain language of the collective bargaining agreement, any argument of pretext fails.

### I. Denial of Volunteer Opportunities

Next, Cooper complains of Bakken's decision not to allow Cooper to engage in voluntary fundraising activities for the police department, either as a Community Service

Officer or otherwise.  As an initial matter, Cooper was not even a public employee at this point.  Moreover, Cooper fails to explain how this decision constitutes a deprivation likely to deter a reasonable public employee from engaging in future First Amendment activities. Finally, Cooper fails to offer any evidence to support a finding that Bakken was motivated by Cooper's prior protected conduct in excluding him from this role.

### J.  Refusal to Release Background Report

The last of Cooper's claimed acts of retaliation may be his greatest stretch of all. Cooper contends that Bakken's refusal in 2018 to release a background report he had prepared when he was a police officer for the City was somehow in retaliation for his prior First Amendment conduct.  First, Bakken provided reasonable bases for refusing to release it, specifically noting Cooper's failure to interview a past employer.  *See* Milliman, 893 F.3d at 430 (requiring plaintiff to put forth evidence at summary judgment from which a reasonable jury could conclude that the proffered reason was a lie).  Second, even crediting Bakken's testimony that he did not find Cooper credible, there is nothing tying her view of Cooper's credibility to his prior protected conduct, at this point more than three years removed from the alleged retaliatory act.

In sum, Cooper appears to list all possibly adverse events subsequent to his opposition to the transfer of police services to the County, however remote, and speculates about a retaliatory basis.  These events, however, must be viewed in light of his prior claims of retaliation and conflict with the City, in particular with Mayor Danielson, and his unprotected conduct of airing personal grievances concerning the results of his investigation of Danielson and the D.A.'s decision not to prosecute.  Even putting aside

this full context, the various events are either so de minimis to not constitute a "deprivation" or entirely untethered from his protected conduct to satisfy the causal nexus requirement, and often both.  For these reasons, the court will grant defendants' motion for summary judgment.

ORDER

IT IS ORDERED that :

1) Defendants City of Black River Falls, Alex Brad Chown, Ronald E. Danielson, and Kelly Bakken's motion for summary judgment (dkt. #21) is GRANTED.

2) Defendants' motion to strike (dkt. #49) is DENIED.

3) The parties' stipulation regarding defendants' motion to strike Cooper's entire declaration (dkt. #59) is GRANTED.

4) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 19th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge